## THE ORANMORE.

### MORRIS v. THE ORANMORE.

*(District Court, D. Maryland. July 21, 1885.)*

INSUFFICIENT FITTINGS OF CATTLE-SHIP—AGREEMENT TO BE GOVERNED BY ENGLISH LAW—EXCEPTIONS IN BILL OF LADING.

> The libelant, a resident of Chicago, made with the agents of a line of British steamers a contract to carry cattle from Baltimore to Liverpool. By a clause of the contract it was agreed that any questions arising under the contract or the bill of lading against the steamer, or her owners, should be determined by English law in England. Cattle shipped under the contract received injuries by reason of the insufficient construction of stalls provided by the ship. The contract having been made in the United States with a British corporation, owner of a British ship, for the carriage of cattle to England, and the parties to the contract having expressly declared their intention that the contract and bill of lading should be governed by the law of England, the place of the performance of the contract of carriage, *held*, that the English law must govern

as to its validity, obligation, and interpretation. *Held, also,* that the exceptions contained in the bill of lading, stipulating that the shipper approved of the cattle fittings, and that the steamer should not be held responsible for any injury to the cattle occasioned by the wrongful acts, default, negligence, or error in judgment of the owner, pilot, master, officers, crew, stevedores, or other persons in the service of the ship, were sufficient, under the rulings of the English courts, to exempt the ship from liability for the injuries complained of.

In Admiralty.

*Sebastian Brown* and *John C. Richberg,* for libelant.

*Brown & Brune,* for respondent.

MORRIS, J. This libel is brought to recover for 67 head of cattle which died and were thrown overboard, and for the depreciation in the value of others, during a voyage on which they were being carried by the British steam-ship Oranmore from Baltimore to Liverpool in January, 1885.

The plaintiff, who is a citizen of the United States, residing in Chicago, shipped on the steamer 320 head of cattle, to be carried on the upper between-decks, and received therefor, through his agent in Baltimore, the bill of lading, dated January 10, 1885, given in evidence. The bill of lading recites that the shipment is made under and subject to the conditions of a "live-stock freight contract," dated at Baltimore, November 19, 1884, signed by the libelant for his father, by which the father had agreed, upon the terms therein expressed, to ship as many cattle as could be carried on the upper between-decks of five of the steamers of the Johnston line plying between Baltimore and Liverpool, of which the Oranmore was one, for two consecutive voyages of each of the five steamers, commencing with the voyage of the Oranmore now in question. The stipulations of this "live-stock freight contract" are much those usually found in similar contracts for carrying cattle across the Atlantic, except the sixteenth clause, which I have not met with before, and which is as follows:

"16. Any questions arising under this contract or the bill of lading against the steamer or her owners shall be determined by English law in England."

The libel alleges that the loss occurred by reason of the insufficient fittings of the stalls which the steamer contracted to provide for the cattle.

The defense is that the fittings were proper and sufficient, and that the cattle were injured and lost by the negligence of the cattle-men sent by the shipper to feed and care for them on the voyage, and by the insufficient amount of bedding put under them by the cattle-men, and by the weakness of the head-ropes furnished by the libelant.

The claimant of the steamer, under the sixteenth clause of the contract, denies the jurisdiction of this court, and also contends that if the court takes jurisdiction the exceptions contained in the bill of lading are to be interpreted according to English law, and that by the English courts these exceptions would be held to relieve the ship from liability, even though the losses happened by reason of the insufficiency of the cattle fittings.

I shall first consider the issue of fact as to whether the loss occurred by reason of defect in the construction of the cattle stalls. It must be conceded, although rough weather was experienced on the voyage, commencing soon after leaving the capes, and that the ship rolled very considerably from a high sea abeam, that this was not unusual January weather, and that the loss is attributable, not to any peril of the sea, but either to the insufficiency of the fittings of the cattle stalls, as contended by the libelant, or, as contended by the claimant of the ship, to the incompetency of the cattle-men, the want of proper head-ropes, and the insufficiency of bedding. The Oranmore is one of six British steamers which constitute what is known as the "Johnston Line," plying regularly between Liverpool and Baltimore, and which specially solicit and are intended for the carriage of live cattle across the Atlantic at all seasons of the year. They have, from time to time, improved the special fittings and facilities for that business, until what was some few years ago considered an extra-hazardous undertaking, has become reasonably certain and safe. The voyage of the Oranmore on which the cattle sued for were lost was the only voyage made by any steamer of the line for a long time on which all the cattle shipped, with the exception of one or two beasts, had not been carried safely at all seasons of the year.

The stalls on the between-decks on the Oranmore for the voyage in question were fitted up differently from any previous voyage, and were altered again before she attempted another. Prior to this voyage the stalls on the between-decks had been put up by erecting stanchions five feet apart, resting on and affixed to a false floor, laid on the iron deck, and at the top shored by braces stretching to the sides of the ship, and to other permanent objects against which they could be braced. While in the port of Baltimore, preparing for this voyage, the cattle fittings on the between-decks previously used having been all taken out on the voyage just made, she having carried no cattle on that voyage, it was determined by the captain and agents in Baltimore, in putting in new stalls, to fasten the stanchions by a new system which had been tried, in some of its features, on other ships of the line and had been found to work well. This was to have holes bored in the iron beams, supporting the deck overhead, and to clamp the stanchions to the beam by an iron clamp and screws, so as to bind the upper end of the stanchion firmly to the beam; the foot of the stanchion to be shored and braced as before. The only difference between this system as applied to the Oranmore, and the same system of clamping to the overhead beams which had been applied on some of the other ships, was that on the Oranmore the stanchions were clamped to every other beam instead of to every beam, and this brought them eight feet apart from center to center. As they had been fastened previously without the iron clamping, they had been five feet apart. Head-boards were used of the same thickness as before; that is to say, about two inches thick.

The contention of the libelant is that as the direct strain of the weight of the cattle when pitching and slipping in rough weather is against the head-board to which they are tied, and by which they sustain themselves, that although the tops of the stanchions were more securely fastened by being clamped to the iron beams overhead, the additional length of three feet between them, with a head-board of no greater thickness than had been sufficient when the stanchions were only five feet apart, produced such a strain that the two-inch head-boards were not strong enough, and broke in many places, letting the cattle get out of the stalls and fall over each other, and become wounded and helpless.

The testimony of the cattle-men is directly and strongly in support of this contention, and goes to show that the great strain and weight of the cattle on each eight-foot head-board caused many of these boards to give way, and also caused the shores at the foot of many of the stanchions to give way, and the stanchions to yield at the foot, and to sway from side to side, although the top remained fast. They also testify that this yielding of the head-boards let the weight of the cattle, in their efforts to keep up, come entirely against the cross cleats nailed to the floor to assist them to keep their footing, and that the cleats in many instances yielded to the weight and came loose, and left the beasts without means of maintaining their footing.

Patient consideration of the testimony leads me to the conclusion that the facts relied on by libelant are established by a preponderance of evidence and probability. The Oranmore appears to have been the only ship of this line on which it was attempted, with beams so far apart, to risk putting the wooden stanchions to every other beam, using a head-board only two inches thick. It is true that in the forward part of the ship there were some iron stanchions 10 feet apart, but with these the head-boards used were three inches thick,—in fact, what are called "joists." Whether the owners intended to leave the fittings on this ship affixed to every other beam, or whether they intended as soon as they could to increase the number of stanchions, and were only prevented from doing so preparatory to the voyage in question by the shortness of the time and the haste to get the vessel off, is a matter which it is not now very easy to determine; the fact is, that immediately after this voyage, and before she made another with cattle, the stanchions were put to every beam, so that they were only four feet apart.

The weight of the testimony leads to the conclusion that placing the stanchions so far apart without increasing the strength of the head-boards was an experiment which no previous experience had justified, and which was made at the risk of the shipper of the cattle during one of the worst winter months, and that it was a negligence or error of judgment for which the ship should be held responsible, unless the shipper has, by the contract contained in the bill of lading, agreed to release the ship.

The bill of lading, among a great many other exceptions and stipulations, contains the following, which appear applicable to the loss sued for in this case:

"* * * The said animals, subject to the stipulations and exceptions hereinafter and before mentioned, are to be delivered from the steamer's deck, where the steamer's responsibility shall cease, at the port of Liverpool or at Birckenhead, unto Jas. Nelson & Sons, or to his or their assigns. Freight payable by consignees at the rate of sixty shillings Br. stg. per head, general average according to York and Antwerp rules."

The following are the exceptions and stipulations above referred to:

"* * * or any other perils of the sea, rivers, navigation, or of land transit, of whatsoever nature or kind, *and whether any of the perils, causes, or things above mentioned, or the loss or injury arising therefrom, be occasioned by the wrongful act, default, negligence, or error in judgment of the owners, pilot, master, officers, crews, stevedores, or other persons* whomsoever, in the service of the ship, or for whose acts the ship-owner would otherwise be liable; or by unseaworthiness of the ship at the commencement of the voyage, (provided all reasonable means have been taken to provide against such unseaworthiness,) or otherwise, howsoever excepted.

"The shipper provides fodder and attendance for the live-stock, and takes all responsibility in their shipping, carriage, and discharge, and for the accidents, damage, and mortality that may happen to them, from whatever cause arising, in loading, discharging, and during the voyage. * * *

"The steamer provides fittings as customary upon steamers of this line, and also provides a condenser for distilling water; but the steamer is not to be held responsible for any defect or insufficiency in said fittings, or in the condenser, or any of its appurtenances, or in the ventilation of the ship, the *same being hereby approved of by the shipper;* nor for any claim notice of which is not given before the delivery of the live-stock by the steamer."

From the above quotations from the bill of lading (which was similar to those constantly before used by the agents of this line of steamers in dealing with this libelant and his father) it appears that the ship-owners have contracted for exemption from the negligence and errors of their employes in putting up the cattle fittings, and have exacted the shipper's approval of them as a condition of issuing the bill of lading.

The embarking of the cattle at Baltimore was attended to by an agent of the libelant, who had for a long time frequently attended to this business for libelant and his father. There was nothing about the appearance of the stall fittings to attract his special attention, and as there was no insurance effected on this shipment, it became no one's special business to critically examine them on behalf of the shipper.

It is conceded that the exemptions of the bill of lading, so far as they are properly applicable to the loss sustained, are, by the English law relating to common carriers, valid and operative; but libelant contends that the bill of lading is to be interpreted by the American law, which, as declared by the federal courts, rejects the attempts of common carriers to exempt themselves from the consequences of want of care and diligence on the part of themselves, or their agents or em-

ployes, and holds such stipulations void as against public policy, and not to be enforced. Where a contract is made in one country to be performed in another, it is not always easy to determine whether the law of the place where the contract was made, or of the place where it is to be performed, is applicable. It seems, however, quite generally conceded that the question is to be determined by arriving at the intent of the parties to the contract, where that is possible. Hutch. Carr. 142; *Chartered Bank of India* v. *Netherlands Nav. Co.*, 10 Q. B. Div. 529. The presumption is that the parties enter into a contract with reference to the law of the place where it is made, but this presumption is easily overthrown by circumstances which show that this was not the intention of the parties. Whart. Confl. Laws, 434. In *Cox* v. *U. S.*, 6 Pet. 203, it is said by the supreme court:

"The law of the place where the contract is made is to govern in expounding and enforcing the contract, unless the parties have a view to its being executed elsewhere, in which case it is to be governed according to the law where it is to be executed."

The present question is not one which affects the capacity of the parties to make the contract. It is not a case in which, according to the American law, it could be said that there is no contract at all binding on the parties. It is merely a question of the extent and nature of the obligations and conditions of a contract. The law is thus stated in Story, Confl. Laws, 242:

"Generally speaking, the validity of a contract is to be decided by the law of the place where it is made, unless it is to be performed in another country; for, as we shall presently see, in the latter case the law of the place of performance is to govern."

And, at page 280:

"The rules already considered suppose the performance of the contract to be in the place where it is made, either expressly or by tacit implication. But where the contract is expressly or tacitly to be performed in any other place, there the general rule is, in conformity to the presumed intention of the parties, that the contract, as to its validity, nature, obligation, and interpretation, is to be governed by the law of the place of performance."

And the author cites, as clearly expressing the rule, the statement of Lord MANSFIELD:

"The law of the place can never be the rule where the transaction is entered into with an express view to the law of another country as the rule by which it is to be governed."

In Whart. Confl. Laws, 472, it is stated to be a rule fairly deducible from adjudged cases that where there are no other controlling circumstances a contract of carriage is to be interpreted by the law of the carrier's principal office. In this case, although the contract was made in the United States, it was made in the port of Baltimore by a resident of Chicago with a British corporation for carriage in a British ship to a port in Great Britain, and the express agreement of the parties, deliberately made two months before the shipment,

was that any question arising against the carrier under the contract or the bill of lading should be determined by English law. .

Under all these circumstances it seems to me the court should give effect to this clause of the agreement. It leaves the intention of the parties beyond doubt of any kind, and that intention was to give to the provisions of the bill of lading such efficacy as the English courts would give to them. As I understand the facts of the case, and the rulings of the English courts upon similar bills of lading, I think the exceptions cover the injuries sustained by this libelant, and the libel must be dismissed.

END OF VOLUME 24.